**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CARMEN'S CORNER STORE, a sole
proprietorship
    302 North Market Street
    Frederick, MD 21701
    (Frederick County), and

ALTIMONT MARK WILKS, an individual,
    25 E Antietam Street
    Hagerstown, MD 21740
    (Washington County)

          *Plaintiffs*,

    v.

U.S. DEPARTMENT OF AGRICULTURE,
    1400 Independence Avenue, SW
    Washington, DC 20250,

U.S. DEPARTMENT OF AGRICULTURE,
FOOD & NUTRITION SERVICE,
    Braddock Metro Center II
    1320 Braddock Place
    Alexandria, VA 22314,

THOMAS J. VILSACK, in his official capacity
as United States Secretary of Agriculture,
    1400 Independence Avenue, SW
    Washington, DC 20250,

STACY DEAN, in her official capacity as
Deputy Under Secretary, USDA's Food,
Nutrition, and Consumer Services,
    Braddock Metro Center II
    1320 Braddock Place
    Alexandria, VA 22314, and

THE UNITED STATES OF AMERICA,
    950 Pennsylvania Avenue, NW
    Washington, DC 20530-0001

          *Defendants*.

Case No. _____

JURY TRIAL DEMANDED

**COMPLAINT FOR JUDICIAL REVIEW,
DECLARATORY AND INJUNCTIVE RELIEF**

Jared McClain
Andrew Ward*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email:jmcclain@ij.org
        award@ij.org

*Pro hac vice motion to be filed*

**INTRODUCTION**

1.     Congress instructed the United States Department of Agriculture to authorize food retailers to accept payment through the Supplemental Nutrition Assistance Program ("SNAP") if the store's participation will further the goal of increasing access to affordable, nutritious groceries for low-income households.

2.     The USDA, however, is actively thwarting that clear congressional command.  Without any explanation or public input, the USDA began applying a strained reading of its own regulations to impose a lifetime ban from SNAP on all businesses owned by anyone who has ever committed *any* offense related to alcohol, tobacco, firearms, or controlled substances.

3.     Two federal courts have already ruled that the USDA's lifetime ban for a store owner's past drug offenses is arbitrary and in contravention of the agency's own regulations.  Yet the USDA still refuses to follow the law.

4.     The agency's persistent misapplication of its lifetime ban hurts the low-income areas that SNAP is meant to help.  The USDA excludes entrepreneurs in low-income areas from competing in their local food-retail market based on past convictions that have nothing to do with SNAP.

5.     The USDA claims that its lifetime ban ensures that only those businesses that will abide by SNAP's rules can participate in the program.  But the agency's other rules belie that explanation.  Businesses that repeatedly violate program rules face a much more lenient punishment than someone who committed a drug offense decades ago.  The USDA's position makes no sense.

6.     The lifetime ban also fails to account for the fact that people change.

7.     Plaintiff Altimont Mark Wilks is a prime example of how the USDA's irrational ban hurts real people.  Public leaders throughout Maryland recognize that Altimont is a success story.  After he served 14 years in prison for drug and firearm offenses, Altimont returned home to western Maryland and opened two community-focused convenient stores, each named Carmen's Corner Store to honor his mother.

8.     For a convenience store like Carmen's Corner Store to fully serve its community and compete in the market, the store must be able to serve customers who rely on SNAP to buy their groceries.  The USDA, however, denied Carmen's application and permanently banned the store from being a SNAP retailer even though Altimont's drug and firearm convictions have nothing to do with the list of "business integrity" offenses in the USDA's regulations.  In the USDA's view, there is simply nothing that Altimont could ever do to convince the agency that he has business integrity because he committed drug and firearm offenses back in 2004.

9.     This case is an appeal of that invalid decision.  The Plaintiffs ask this Court to vacate the USDA's denial of Carmen's application and order the agency to consider the application on its merits.

## JURISDICTION AND VENUE

10.    Plaintiffs Carmen's Corner Store and Altimont Mark Wilks bring this action to challenge the USDA's permanent ban of Carmen's Corner Store from SNAP, 7 U.S.C. §§ 2011–2036d.

11.    This Court has jurisdiction over this action under 7 U.S.C. § 2023(a)(15) (*de novo* judicial review), and 28 U.S.C. § 1331 (federal question), § 1346 (U.S. as defendant), § 1361 (action to compel a federal agency or officer).

12.     This Court has the authority to declare the plaintiffs' rights pursuant to 28 U.S.C. § 2201 and grant further relief pursuant to § 2202.

13.     Venue lies in this Court based on 28 U.S.C. § 1391(e), 7 U.S.C. § 2023(a)(13), and 7 C.F.R. § 279.7(a).  Altimont is a resident of Washington County, Maryland, and Carmen's Corner Store is located at 302 N. Market Street, Frederick, MD 21701, which is within Frederick County and the Northern Division of the United States District Court for the District of Maryland.

## THE PARTIES

14.     Plaintiff Carmen's Corner Store is a sole proprietorship located in Frederick, Maryland, organized under the laws of Maryland.

15.     Plaintiff Altimont Mark Wilks lives in Washington County, Maryland.  He is the sole owner of two community-focused convenience stores in Maryland.  Altimont opened the Frederick location of Carmen's, the one at issue in this lawsuit, in 2021.  He created his stores to provide affordable grocery options to the underserved low-income families in his community, while also providing vital community services throughout the region.  But the USDA's exclusion of Carmen's from being a SNAP retailer has made the store's business model unsustainable, as many of Carmen's customers rely on SNAP to purchase their groceries.

16.     Defendant U.S. Department of Agriculture is the federal administrative agency that Congress tasked with administering SNAP.  The administrative proceeding at issue in this case concerned Altimont's application for Carmen's Corner Store in Frederick to participate in SNAP as a food retail store.  The USDA has excluded Carmen's from being a SNAP retailer because Altimont committed drug and firearm crimes nearly 20 years ago—even though he's already completed his full sentence.

17.     Defendant Thomas J. Vilsack is sued in his official capacity as the U.S. Secretary of Agriculture.  In that capacity, he is responsible for the oversight, administration, and enforcement of SNAP and food-retail-store applications.  Secretary Vilsack's designees permanently excluded Carmen's from participating as a SNAP retailer.

18.     Defendant Food & Nutrition Service is a subagency of the USDA.  FNS promulgated the regulation at issue, and its agents permanently denied Carmen's application to be a SNAP retailer on August 16, 2022, at the initial stage of administrative review.

19.     Defendant Stacy Dean is the Deputy Under Secretary for USDA's Food, Nutrition, and Consumer Services.  In that capacity, she is responsible for the oversight, administration, and enforcement of FNS's programs and regulations, including SNAP and food-retail-store applications.  Under Secretary Dean's designees permanently excluded Carmen's from participating as a SNAP retailer at the initial stage of administrative review.

20.     Defendant United States of America is a party to this suit pursuant to 7 U.S.C. § 2023.

## BACKGROUND

### A. Carmen's Corner Store

21.     Altimont established the original Carmen's Corner Store with the goal of creating a community convenience store that offers affordable grocery options to the community, with an emphasis on providing quality services to families who want a food retailer that is community-conscious and crime-free.

22.     Carmen's Corner Store sells staple food items that qualify for SNAP, including a unique variety of items from distant ethnic regions.

23.     Carmen's Corner Store also offers co-retailing opportunities to lift up other local entrepreneurs, with a particular focus on minority business development and helping returning citizens access the local retail market.

24.     Through Carmen's, Altimont believes he can be a role model for other returning citizens.  He models his business around his life's work of advocating for equal economic opportunities for those people who have served their time and now want to become business owners.

25.     Altimont opened the first location of Carmen's Corner Store in Hagerstown on April 1, 2019.

26.     He named the store to honor his mother, Carmen, who, along with his sister, Patricia, helped get him on track to open his own business.

27.     Carmen and Patricia's help was invaluable to Altimont, who dreamed of being a business owner when he returned home from prison after serving time for dealing drugs.

28.     Altimont was arrested by a drug task force in 2004 after he participated in a controlled buy across the Maryland state line.

29.     For his offenses, Altimont faced both state and federal time.  He accepted responsibility and pleaded guilty to two federal counts of interstate travel in the aid of racketeering and to one count of possession of a firearm in connection to drug trafficking in violation of state law.

30.     None of these offenses have anything to do with Carmen's Corner Store, which would not even exist for another 15 years.

31. Altimont served time in federal and state prisons from the time of his arrest in 2004 until his release in June 2018.

32. When he returned home, Altimont wanted a fresh start.

33. Altimont's goal was to become a business owner.

34. He began driving for FedEx to start saving money.

35. He also started joining community organizations and working to give back.

36. Altimont even joined the Rotary Club alongside the judge who sentenced him, and he began working with state officials to help train other returning citizens.

37. While living in downtown Hagerstown, Altimont saw his area was a food desert that lacked good food options that neighborhood families could access without a car.

38. About 21% of locals within the 21740 zip code around the Hagerstown store rely on SNAP benefits.

39. Less than a year after his release, Altimont combined his own savings from his work at FedEx with the investment form his family, and he opened his first store in downtown Hagerstown to serve the locals who live in his neighborhood or go to nearby schools and businesses.

40. After a successful soft opening, Altimont held a grand opening for his Hagerstown store on July 16, 2019.

41. Several community leaders attended the event, and many more sent Altimont accolades and certificates celebrating the store's opening:

   a. United States Senator Chris Van Hollen presented Carmen's Corner Store with a Citation in celebration of its Grand Opening, "[i]n anticipation of its providing convenient and affordable items and of its

8

becoming a cornerstone of the community, and with best wishes for success." (A copy is attached as Exhibit 1).

b.   Congressman David Trone congratulated Carmen's Corner Store on its Grand Opening and presented a Certificate of Special Congressional Recognition. (A copy is attached as Exhibit 2).

c.   The Maryland General Assembly issued an Official Citation congratulating Carmen's Corner Store and recognizing the Grand Opening. (A copy is attached as Exhibit 3).

d.   The Washington County Board of County Commissioners congratulated Carmen's Corner Store and offered thanks "for investing in the community and in Washington County[.]" (A copy is attached as Exhibit 4).

e.   Hagerstown Mayor Robert E. Bruchey II also offered a special recognition for Carmen's "investment in [the] community." Mayor Bruchey declared that "Carmen's Corner Store is doing its part to uplift the community and improve the living standards of area families," and helps "make Hagerstown a great place to live, work, and visit[.]" (A copy is attached as Exhibit 5).

f.   The Maryland Small Business Development Center saluted Carmen's Corner Store's "efforts on the success of our nation's dreamers, innovators, and doers[.]" (A copy is attached as Exhibit 6).

42.   The positive recognition of Altimont and Carmen's Corner Store's contributions to the community did not end with its grand opening: The *Herald-Mail* ran

a story on December 25, 2019, highlighting Carmen's work handing out free holiday meals and gift bags to those in need.[1]

43.    As he's run Carmen's Corner Store, Altimont has continued working to ensure that he develops new ways to contribute to his community and be a successful entrepreneur.

44.    On January 22, 2020, for instance, Congressman Trone presented Mr. Wilks with a Certificate of Congressional Recognition for the inaugural class of Knowledge Empowers You ("K.E.Y."), a pilot program that Altimont created to help returning citizens in Hagerstown become entrepreneurs.  (A copy is attached as Exhibit 7).

45.    The K.E.Y. program is just one part of Altimont's broader effort to help people newly released from prison; he works directly with Reentry Services and Correctional Education and serves as a reentry coach.

46.    As an advocate for reentry reform, Altimont has worked in that capacity with Secretary Carol Scruggs of the Maryland Department of Public Safety and Correctional Services.

47.    Given the successful opening of his first store and the support he received throughout the community, Altimont opened a second store in April 2021—this one in Frederick, Maryland.

48.    Like his first store, Altimont named the second store Carmen's Corner Store.

49.    About 8% of households surrounding the new Frederick location rely on SNAP benefits.

---

[1] Sherry Greenfield, *Hagerstown's Needy Line Up for Free Christmas Dinner and Treats*, Herald-Mail (Dec. 25, 2019), *available at* https://www.heraldmailmedia.com/instant/hagerstown-s-needy-line-up-for-free-christmas-dinnerand/article_50a5f758-276f-11ea-bc99-cf8fc49d75b9.html.

50.     Although Frederick has fewer households on government assistance than Hagerstown, Carmen's customer base is substantially more likely to depend on SNAP benefits than the average Frederick resident.

51.     The Downtown Frederick Partnership promoted the grand opening of Carmen's second store.  The Partnership touted that Carmen's "is on a mission to bring economic growth to the 300 block of North Market Street."[2]

52.     Community leaders once again attended the ceremonial grand opening of Altimont's store.

53.     While he operated his two stores, Altimont served on Comptroller Peter Franchot's Business Advisory Council for Public Safety and Correctional Services.  (An image of Comptroller Franchot recognizing Altimont's contributions is attached as Exhibit 8).

54.     On May 5, 2022, then-Maryland Comptroller Franchot presented Altimont with a proclamation celebrating Carmen's three years in business.

55.     Comptroller Franchot's successor, Comptroller Brooke Lierman, has also invited Altimont to serve on one of the new advisory groups that Comptroller Lierman is planning to convene.

56.     Altimont continues to contribute to Maryland's business community and advocate for reentry reforms to help other aspiring entrepreneurs.

57.     Altimont has consistently demonstrated his business integrity since he opened his first Carmen's Corner Store.

---

[2] Carmen's Corner Store, Downtown Frederick Partnership, *available at* https://downtownfrederick.org/item/carmens-corner-store/.

**B. Carmen's SNAP Retailer Application**

58.     Given the percentage of Carmen's local customer base that relies on SNAP to purchase the store's food items, being able to accept SNAP benefits is vital to Carmen's long-term success and ability to compete in the local food-retail market.

59.     The USDA, however, denied an application for Carmen's Hagerstown store back in 2019, ruling that Altimont's past arrests for drug and firearm offenses meant that he lacked the "business integrity" to be a SNAP retailer.

60.     Altimont filed a new application for his Frederick store in 2022; the agency's denial of that application gives rise to this lawsuit.

**1. SNAP's Regulatory Framework**

61.     A statutory and regulatory framework sets out how a food retailer like Carmen's Corner Store becomes eligible and can apply to participate in SNAP.

62.     Congress established SNAP as part of the Food Stamp Act of 1964, a predecessor to the Food and Nutrition Act of 2008, currently codified at 7 U.S.C. §§ 2011 *et seq*.

63.     The program's purpose is "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households."

64.     SNAP aims to close the "grocery gap" (*i.e.*, the lack of reasonably priced nutritional foods in low-income areas) by providing supplemental funds for low-income households to purchase groceries.

65.     To accomplish its purpose, SNAP provides low-income households with an Electronic Benefits Transfer ("EBT") card, which functions like a debit card that beneficiaries can use only on designated food items at authorized SNAP retailers.

### a. Food Retailers Under SNAP

66.     Food retailers—including small, independently owned grocers in low-income areas, like Carmen's—are critical to advancing SNAP's policy objectives by creating a competitive market of nutritional foods for SNAP recipients to purchase with their benefits.

67.     By providing beneficiaries with a place to purchase nutritional foods—particularly in urban food deserts—the participation of local grocers is critical to SNAP's success.

68.     Congress determined that "retail food stores," among other types of businesses, could participate as SNAP retailers that accept payment for groceries through EBT.

69.     The law defines a "retail food store" to mean "an establishment" that "sells food for home preparation and consumption."

70.     To qualify, a store must sell, "on a continuous basis, a variety of at least 7 foods in each of the 4 categories of staple foods … , including perishable foods in at least 3 of the categories," or have "staple foods" make up at least 50% of its sales.

71.     The USDA must determine whether an establishment qualifies on a store-by-store basis by conducting "visual inspection, sales records, purchase records, counting of stockkeeping units, or other inventory or accounting recordkeeping methods that are customary or reasonable in the retail food industry."

72.     Congress also requires the USDA to visit any store that applies to be a SNAP retailer to assess the store's "size, location, and type of items sold" before deciding to approve or reauthorize the store.

73.     To implement this law, the USDA promulgated regulations that a firm must follow to become a SNAP retailer.

74.     The regulations define "firm" to mean a "retail food store that is [or is not] authorized to accept or redeem SNAP benefits"; the agency uses the terms "entity, retailer, and store" interchangeably with "firm."

75.     Correspondingly, the USDA adopted a definition of "retail food store" that largely mirrors the definition in the U.S. Code.

76.     The agency's definition of "retail food store" also establishes that the term refers to a single business location; indeed, it clarifies that "[e]stablishments that include separate businesses that operate under one roof and share the following commonalities: Ownership, sale of similar foods, and shared inventory, are considered to be a single firm when determining eligibility to participate in SNAP as retail food stores."

### b. The USDA's Lifetime Ban of Food Retailers

77.     A firm that wants to accept payment through SNAP must apply to the USDA for approval.

78.     Congress, through 7 U.S.C. § 2018, instructed the USDA to promulgate regulations that "*shall* provide for the approval of those [food retailers] whose participation will effectuate the purposes" of SNAP.  (Emphasis added).

79.     Congress enumerated five factors for the agency to consider when assessing a store's application: (1) the nature and extent of the store's food business; (2) how many benefits transactions are expected; (3) whether the store is in an area with significantly limited access to food; (4) the availability of EBT equipment; and (5) the business integrity and reputation of the store's owner.

80.     To carry out this statutory mandate, the USDA initially promulgated a rule that permitted one of its subagencies, the Food and Nutrition Service ("FNS"), to consider "[c]riminal conviction records reflecting on the honesty or integrity of officers or managers of the applicant firm." 7 C.F.R. § 278.1(b)(3)(i) (1973).

81.     The agency eventually initiated a rulemaking to amend its initial rule back in May 1998.  It proposed a new business-integrity rule, which explained that "[e]xamples of [] business integrity matters include conviction or civil liability for offenses such as insurance fraud, tax fraud, and embezzlement."  63 Fed. Reg. 24,985, 24,989 (May 6, 1998).

82.     After public commenters complained that the breadth of the proposed business-integrity standards left too much room for agency discretion in assessing applicants, FNS tweaked its standard in a final rule promulgated in April 1999.

83.     To limit the agency's discretion in determining which offenses implicate an owner's business integrity, the final rule provided a more targeted, detailed list of relevant offenses.

84.     The final rule explained that the agency would focus specifically on "[*f*]*raudulent activity* in the FSP *or other government programs*, or in business-related activities in general," because those offenses "reflect[] on the ability of a firm to effectuate the purposes of the FSP and abide by the rules governing the program."  (Emphasis added).

85.     Consistent with this goal of permanently excluding businesses that have behaved fraudulently in other government programs, the agency explained that "business integrity matters that fall under this category include conviction or civil judgment for offenses such as: embezzlement, theft, forgery, bribery, false statements, receiving stolen

property, false claims, or obstruction of justice; commission of fraud in connection with obtaining, attempting to obtain, or performing a public or private agreement or transaction; and violation of Federal, State and/or local *consumer protection laws* or other laws relating to alcohol, tobacco, firearms, controlled substances and/or gaming *licenses*." (Emphases added).

86.     The final rule then offered examples of Federal, State, and local consumer-protection and licensing laws that the agency considered relevant to a SNAP retailer's business integrity: "The final rule retains the proposed provision that firms removed for administrative reasons from Federal, State or local programs shall be prohibited from applying for the FSP during the period of removal from such programs.  Such action in the FSP would be taken, for example, if a firm is removed from another federal program, *or had their State or local liquor or lottery license suspended*."  (Emphasis added).

87.     The final rule required that a single criminal or civil judgment finding that an applicant violated one of these laws or the rules of a government licensing program must result in a permanent ban from being a SNAP retailer.

88.     Even if a business owner's licensing infractions did not amount to a criminal conviction or civil judgment, the final rule provided that the agency could still consider those offenses as evidence that a retailer lack of business integrity; three such findings would result in a permanent ban.

89.     The USDA's business-integrity rule, now codified at 7 C.F.R. § 278.1(b)(3), now requires FNS to consider "information regarding the business integrity and reputation of the firm as follows":

> (i) Conviction of or civil judgment against the owners, officers or managers of the firm for:

(A) Commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public or private agreement or transaction;

(B) Commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, receiving stolen property, making false claims, or obstruction of justice; or

(C) Violation of Federal, State and/or local consumer protection laws or other laws relating to alcohol, tobacco, firearms, controlled substances, and/or gaming licenses.

90.    To implement this rule, however, SNAP created a retailer application that applies the rule much more broadly by asking applicants: "Was any officer, owner, partner, member, and/or manager convicted of *any* crime after June 1, 1999?" (Emphasis added).

91.    The USDA's current application no longer focuses on licensing laws as contemplated by the final rule; instead, any conviction relating to alcohol, tobacco, firearms, or controlled substances *at all* is grounds for a retailer's permanent denial from SNAP.

92.    In other words, contrary to the text of its regulations, the USDA no longer applies its business-integrity rule to only those offenses relating to consumer protection or the *licensing* of alcohol, tobacco, firearms, or controlled substances.

93.    Under the USDA's current interpretation of its rule, *any* conviction relating to alcohol, tobacco, firearms, or controlled substance is enough to permanently exclude a retailer from the program.

94.     A firm that the USDA excludes under the business-integrity rule can file a written request for agency review, and a designee of the Secretary decides whether to affirm its permanent ban from SNAP.

95.     A firm aggrieved by the agency's final determination may then obtain judicial review by filing a complaint in its local federal district court within 30 days.

96.     The district court then conducts a trial *de novo* to determine whether the agency action is invalid (*e.g.*, unconstitutional, not authorized by law, or arbitrary and capricious).

### 2.  Both Carmen's Corner Stores Applied to Be SNAP Retailers

#### a.  The Hagerstown Store's Application

97.     In 2019, after Altimont opened his first location of Carmen's Corner Store in Hagerstown, he filed an application for the store to be a SNAP retailer.

98.     In the application, Altimont indicated that he had been convicted of crimes relating to drugs and firearms in the past.

99.     The agency sent Altimont a letter dated September 26, 2019, permanently denying the first Carmen's store's participation in SNAP, "at the following location" in Hagerstown, because it determined that Altimont, as the store's owner, lacked the necessary business integrity to further the purposes of SNAP.  (A copy is attached as Exhibit 9).

#### b.  The Frederick Store's Application

100.    In March 2022, Altimont filed a SNAP retailer application on behalf of Carmen's Frederick store.

101.    He again indicated that he had prior convictions and, at the agency's request, supplemented his application through FNS's online portal with additional information about his criminal record.

102.    The USDA confirmed by email on April 20 that it received information from him through the FNS portal.

103.    On May 12, a USDA program specialist let Altimont know that the agency's policy board was reviewing whether his Frederick store's application satisfied the business-integrity rule.

104.    On June 29, despite Altimont supplementing his application with all relevant information and following up with the agency several times, the USDA withdrew Altimont's application, claiming that it had not received the information it had confirmed it received back in April.

105.    At the agency's invitation, Altimont resubmitted his application with the records of his criminal convictions on August 16.

106.    On September 1, the USDA sent Altimont a letter dated August 16 (the same day he reapplied), in which the agency informed Altimont that it denied Carmen's application to participate as an authorized SNAP retailer at its Frederick location.

107.    The agency cited its regulations 7 C.F.R. § 278.1(b)(3) and (k)(3), which require FNS to deny any firm "it determines lacks the necessary business integrity and reputation to further the purposes of SNAP," including those "for which records of criminal conviction or civil judgment against the owners, officers, or managers exist."

108.    The letter explained that the Frederick location of Carmen's was permanently denied from participating in SNAP because FNS "determined that Altimont

Mark Wilks, owner of Carmen's Corner Store, lacks the necessary business integrity to further the purposes of SNAP." (A copy is attached as Exhibit 10).

109.    By email on September 10, Altimont filed a timely written request for review, seeking an administrative appeal of the denial. (A copy is attached as Exhibit 11).

110.    Altimont's written request alerted the agency that it had misinterpreted FNS's lifetime ban, which is limited textually to business-related offenses and crimes relating to "licenses."

111.    His written request also cited case law explaining that the lifetime ban of Carmen's Frederick location is invalid, counter to congressional authorization, and that the regulation is arbitrary and capricious because his past convictions have nothing to do with his business and the law can't punish people forever for convictions unrelated to their work.

112.    On October 6, at the invitation of the USDA, Altimont then supplemented his request for administrative review with news articles and other accommodations that highlighted his business reputation within the community. (A copy is attached as Exhibit 12).

113.    Over seven months after he filed his appeal and well over a year since he initially applied, Altimont sent the USDA on May 8, 2023, to request that the agency complete its administrative review. (A copy is attached as Exhibit 13).

114.    His letter explained that, based on his "understanding of the rules and the USDA's previous permanent denial of my application, the agency is just going to deny my application and exclude my business from SNAP forever"; he pleaded for the prompt resolution of his administrative appeal because "[t]he long delay [wa]s creating uncertainty about the future of my business."

20

115.    The USDA finally denied the Frederick store's application in a letter dated July 6, 2023, over a year after Carmen's Frederick application.  (A copy is attached as Exhibit 14).

116.    The denial letter, signed by Administrative Review Officer David Shively, said that the USDA denied the Frederick store's appeal as "moot" because Altimont did not appeal the denial of his Hagerstown store's application back in 2019.

117.    Altimont had communicated with agency officials about the Frederick store's application more than a half dozen times throughout the year his appeal progressed through the administrative process.

118.    Agency officials were aware throughout that time that Altimont had another store's application permanently denied in the past, and no one ever indicated that his Frederick store's application could not proceed because of the denial of his Hagerstown store.

119.    They did not, for instance, suggest that the Hagerstown store's denial prevented his new store from applying when, in August 2022, they invited him to reapply for the Frederick store with further documentation of his criminal record.

120.    Indeed, when agency officials initially denied the Frederick store's application on September 1, the agency denied his application under the "business integrity" rule and made no mention that his application was "moot."

121.    Yet for the first time at the final level of agency review, the USDA insisted that it could not provide any relief in its review of his Frederick store's application because Altimont couldn't prove why the agency's ban of his Hagerstown store was no longer in effect—something no agency official had ever asked him to prove.

122.    Altimont responded by email asking for clarification; he said that, before he sued, he wanted to make sure the agency knew that there were two separate Carmen's Corner Stores and that the Frederick location—the one which was currently under consideration—did not even exist back in 2019 when the USDA permanently banned the Hagerstown store from being a SNAP retailer.

123.    Administrative Review Officer Shively responded to Altimont's email on July 28, 2023, saying simply, "Thank you."

124.    On information and belief, the USDA concocted "mootness" as an excuse to deny the Frederick store's application to impede Carmen's ability to substantively challenge the agency's continued misapplication of its regulation to permanently ban business owners like Altimont for any offense related to alcohol, tobacco, firearms, or controlled substances.

125.    The USDA's dismissal of the Frederick store's application, purportedly because of the earlier Hagerstown denial, is contrary to regulation and usual USDA policy, both of which separately assess the applications of physically separate stores.

126.    If not for the USDA's misreading of its regulations and misapplication of its business-integrity rule, Carmen's Corner Store in Frederick (as well as its Hagerstown location) would qualify to be a SNAP retailer.

<strong>CLAIMS</strong>

127.    Congress empowered the courts to review and correct invalid administrative action by the USDA.

128.    An administrative action is invalid if it is arbitrary and capricious, without justification, or if it misapplies, is contrary to, or unauthorized by law.

22

**Count I:**
**USDA's Decision to Deny Carmen's Application as "Moot" Was Invalid**
**(7 U.S.C. § 2023(a)(15))**

129.   The allegations above are incorporated here in full.

130.   As an initial matter, the USDA's decision to deny as "moot" the application of the Frederick location of Carmen's Corner Store was invalid because the Frederick store had never been denied participation in SNAP.

131.   The USDA's regulations and SNAP's organic statutes consider an individual store or "firm"—not the owner—as the applicant that is approved or denied being a SNAP retailer.

132.   Congress defined "retail food store" as "*an* establishment … that sells food for home preparation and consumption and … offers for sale, on a continuous basis, a variety of at least 7 foods in each of the 4 categories of staple foods … , including perishable foods" or has over 50% of its sales in staple foods.  (Emphasis added.)

133.   To assess whether an individual store meets the criteria that Congress set, the law requires the agency to conduct a "visual inspection" of the applicant's physical store.

134.   Consistent with the law, the USDA's regulations define a "firm" as "*a* retail food store that is [or is not] entitled to accept or redeem SNAP benefits."  (Emphasis added).

135.   The regulations define a "retail food store" as "[*a*]*n* establishment … that sells food … displayed in a public area … , evidenced by having no fewer than seven different varieties of food items … with a minimum depth of stock of three stocking units." (Emphasis added).

23

136.    Consistent with the law and the agency's regulations defining a firm as an individual store, the regulations treat multiple businesses operating under one roof as a single "firm" for the purposes of SNAP.

137.    Each individual physical location of a store is its own firm under the law and the agency's regulations.

138.    This straightforward reading aligns with the law's focus on factors for qualification such as a store's size and location, as well as the specific items sold and kept in stock in a particular store and the percentage of a store's sales consisting of staple foods.

139.    This reading is also consistent with the factors that Congress enumerated when assessing a store's application, including the amount of SNAP benefits that a store expects to accept and whether the store is in an area with significantly limited access to food.

140.    This reading is also consistent with the law's requirement that an agency official visit an individual store when considering an application for approval or reauthorization.

141.    Given all this focus on the specific features of an individual store, it wouldn't make sense for the USDA to approve *or* deny a new store in a different location based on a prior application of a different store with the same owner.

142.    If an individual or ownership group operates more than one food retailer store, each store must individually qualify and apply to participate as a SNAP retailer.

143.    A penalty or disqualification of one store will impact other stores operated by the same ownership only in certain, specified instances.

144. For instance, the agency "may withdraw the authorization of any firm that is under the same ownership as an unauthorized firm that has failed to pay [] a fine, as specified under § 278.1(k)."

145. Unless otherwise specified, the denial or disqualification of one firm does not prohibit the participation of another firm under the same ownership—and it certainly does not prevent the USDA from even considering an application from a new firm.

146. No regulation prevents a firm from applying to be a SNAP retailer just because the agency denied a prior application by another firm with the same owner.

147. No regulation automatically excludes all of an owner's firms from applying for SNAP just because another of the owner's firms was denied participation in the program.

148. Even if the USDA might have conceivably promulgated rules to permanently ban an owner rather than a firm, or rules that permanently ban all other firms in the same ownership group based off a single firm's application, the agency did not do so.

149. The business-integrity rule's application to a single store rather than every store operated by the same owner is confirmed by the USDA's letter denying the Hagerstown store's application in September 2019, which stated explicitly that the permanent denial applied "at the following location" before listing the Hagerstown store's address. *See* Exh. 9.

150. The agency also acted consistently with the plain reading of its regulations throughout the process when it acknowledged that Altimont had previously had a different store permanently denied, and it still allowed his new store to apply, and then

FNS denied the Frederick store based on the business-integrity rule rather than some theory of mootness.

151.     The USDA's sudden refusal to consider the administrative appeal of an application denial by one firm based on a prior denial of another firm is contrary to the regulatory scheme set up by Congress and the agency.

152.     Because the Frederick store had never before applied to be a SNAP retailer—and did not even exist the last time Altimont applied for one of his stores—the USDA's decision to deny the administrative appeal of Carmen's Frederick location as "moot" based on its prior denial of another store was invalid.

**Count II:**
**USDA's Decision to Deny Carmen's Participation in SNAP Was Based on an**
**Invalid Reading of Its Business-Integrity Rule**
**(7 U.S.C. § 2023(a)(15))**

153.     The allegations above are incorporated here in full.

154.     The USDA's denial of Carmen's Corner Store's application to be a SNAP retailer was invalid because the decision was based on an incorrect reading of the agency's business-integrity rule.

155.     Congress required the USDA to promulgate regulations that allow retail food stores to accept SNAP benefits if their participation will further the purposes of the program.

156.     Because SNAP's purpose is to provide food security to families in need, the remedial statutes and regulations at issue must be construed to allow participation in the program, meaning that rules that exclude retailers from participating in SNAP should be construed narrowly.

157.    One of several factors that Congress instructed the USDA to consider in allowing retailers to participate in SNAP is the applicant's business integrity and reputation.

158.    The USDA promulgated a rule codifying its interpretation of what conduct it considers to materially impact a business's integrity and reputation.

159.    After initially proposing an open-ended rule, the USDA narrowed the scope of its business-integrity rule in response to criticism that its proposal gave the agency too much discretion to exclude businesses.

160.    The final rule clarified that the USDA would consider an offense to negatively implicate a business's integrity and reputation only if the offense related to fraudulent activity in "government programs[] or in business-related activities in general."

161.    Specifically, the final rule listed several offenses relating to business activities such as fraud and embezzlement in addition to similar offenses relating to government programs, including "commission of fraud in connection with … a public or private agreement" and "violation of Federal, State and/or local consumer protection laws and other laws relating to alcohol, tobacco, firearms, controlled substances and/or gaming licenses."

162.    The reference to "other laws relating to alcohol, tobacco, firearms, controlled substances and/or gaming licenses" is a catch-all provision that follows and refers to other types of "consumer protection laws."

163.    Such consumer-protection and licensing laws are just one part of a larger list of offenses that relate to the honesty of a business owner, such as "embezzlement, theft, forgery, bribery, false statements, receiving stolen property, false claims, or

obstruction of justice," and the commission of fraud in connection with obtaining or performing a public or private agreement or transactions.

164.    *Noscitur a sociis* instructs that words should be interpreted by reference to the other words in the context that they appear.

165.    Similarly, *ejusdem generis* counsels that when general words follow specific words, the general words typically refer to only terms that are similar in nature to the specifically enumerated terms that precede them.

166.    Both canons of interpretation require reading "other laws relating to alcohol, tobacco, firearms, controlled substances and/or gaming licenses" to refer only to licensing laws that relate to consumer protection and fraudulent business activities.

167.    "[O]ther laws relating to alcohol, tobacco, firearms, controlled substances and/or gaming licenses" is a single integrated list of licensing offenses.

168.    The word "licenses" following the list of "other laws" is a limiting clause that modifies each item on the list that immediately precedes it, so that the list refers to: "other laws relating to alcohol licenses, tobacco licenses, firearms licenses, controlled substances licenses and/or gaming licenses."

169.    Given the provision's broader focus on fraudulent business activities and the immediately preceding reference to consumer protection, no reason exists consistent with the statutory or regulatory to apply the limiting phrase of "licenses" to "gaming" alone and not also to "alcohol, tobacco, firearms, [and] controlled substances."

170.    The plain reading of the business-integrity rule limits its application to offenses relating to the licensing of alcohol, tobacco, firearms, and controlled substances.

171.    Otherwise, it would not make sense to include a highly specific restriction on "gaming licenses" violations together with a much more broadly drawn prohibition on *any* violation relating to alcohol, tobacco, firearms, or controlled substances.

172.    This natural reading of the regulation is also consistent with the general provision's limited application to crimes related to business and a business owner's honesty.

173.    Other offenses relating to alcohol, tobacco, drugs, and firearms generally are incongruent with the other items on the list and have nothing to do with a business owner's participation in SNAP.

174.    Altimont's decades-old convictions for drug and firearm offenses do not fall within the scope of the business-integrity rule.

175.    Altimont has not been convicted of any crimes related to alcohol licenses, tobacco licenses, firearms licenses, controlled substances licenses, or gaming licenses.

176.    Nothing in Altimont's record suggests that he is untrustworthy or would defraud SNAP.

177.    The USDA's application of its business-integrity rule to Altimont based on his decades-old convictions for drug and firearm offenses is invalid.

**Count III:**
**USDA's Decision to Deny Carmen's SNAP Application Exceeded the**
**Agency's Statutory Authority**
**(7 U.S.C. § 2023(a)(15))**

178.    The allegations above are incorporated here in full.

179.    The statute authorizing SNAP requires the USDA to promulgate rules that "*shall* provide for the approval of those [retail food stores] whose participation will effectuate the purposes" of the program.

29

180.  SNAP's purpose "is to provide food security to needy families"; courts construe the program to allow for increased participation rather than forbidding it.

181.  The USDA does not have authority to exclude a food retailer from SNAP if the store's participation would further the purposes of the program of closing the grocery gap to provide food security to families in need.

182.  Congress authorized the USDA to exclude a food retailer from participating in SNAP only if a retailer's "*business* integrity and reputation" gave the agency cause to believe that the store's owners and managers might cheat the program, for their own financial gain, at the expense of the taxpayers.

183.  But the USDA's "business integrity" rule applies to offenses that have nothing to do with a business's integrity.

184.  The USDA's permanent ban applies to all offenses related to alcohol, tobacco, firearms, and controlled substance—regardless of whether the offenses have anything to do with their business and regardless of whether the owner committed the offenses while they owned the business.

185.  Congress also limited the USDA's authority to exclude retailers permanently when such a punishment "reflects the severity" of the agency's basis for denying an applicant.

186.  The USDA, however, is applying its most severe ban on businesses owned by someone who, at some point in their life, has been drunk in public or had simple possession of marijuana.

187.  A permanent ban for all offenses relating to alcohol, tobacco, firearms, and controlled substances does not reflect the severity of the offense—particularly when business owners who have actually defrauded SNAP receive more lenient punishments.

188.    The Court could save the USDA's business-integrity rule by reading it as applying to only licensing offenses and fraud-like crimes related to a business's integrity; but applying to rule to all alcohol, tobacco, firearm, and controlled substance offenses would exceed the scope of the USDA's statutory authority.

189.    If this Court accepts the USDA's interpretation of its business-integrity rule (at issue in Count II), then that rule and the agency's application of that rule to Carmen's is invalid because it exceeds the scope of the USDA's power to exclude retailers from SNAP.

## Count IV:
## USDA's Decision to Deny Carmen's Participation in SNAP Was Arbitrary & Capricious
## (7 U.S.C. § 2023(a)(15))

190.    The allegations above are incorporated here in full.

191.    The USDA's basis for permanently banning Carmen's Corner Store from SNAP does not make sense.

192.    A rule that permanently bans a business from SNAP based on an owner's old convictions unrelated to his business or its integrity is nonsensical, unreasonable, and contrary to the purpose of SNAP.

193.    Nothing in Altimont's past—including the fact that he sold drugs decades ago—suggests he would defraud SNAP.

194.    Indeed, most offenses relating to alcohol, tobacco, firearms, and controlled substances have absolutely nothing to do with SNAP.

195.    A business owner's past arrest for drinking in public or even a DUI does not suggest that they will defraud a government program.

196.   Nor does a hunting violation or possessing someone else's prescription drugs.

197.   The permanence of the ban is also arbitrary because the reputation of a business (and its owner) can change over time.

198.   Rates of recidivism decrease sharply over time—especially as people get older.

199.   People change; they also mature with age.

200.   Altimont is a prime example of a business owner who improved his standing in the community, as demonstrated by the many public leaders who offered their support at Carmen's grand openings and have continued to do so since.

201.   The USDA, however, irrationally ignored how significantly Altimont's reputation has improved since 2004 when he was convicted of selling drugs.

202.   That decision was arbitrary and capricious.

203.   The USDA's permanent ban of Carmen's Frederick location was also arbitrary because the agency imposes more lenient bans on stores that actually violate SNAP's rules in serious ways.

204.   Even though the ostensible point of the USDA banning business owners who have committed drug crimes in the past is to exclude businesses without the integrity to abide by SNAP's rules, the USDA irrationally imposes more lenient punishments on firms that have actually failed to follow SNAP's rules.

205.   For instance, initial violations of SNAP rules can carry a ban of only six months to a year.

206.    Firms face only a three-year ban if the firm "knowingly submitted" false information on their application that is both substantive and relates to the agency's ability to monitor the firm's compliance.

207.    Similarly, firms face only a three-year ban when the firm's *practice* is to violate program rules and the agency has already advised the firm of the possibility that it was committing such violations.

208.    It carries only a five-year ban if firms do things like knowingly accept benefits from someone who they know does not possess them legally, if the firm's coupon redemptions exceed its sales, or if it's the firm's *practice* to sell expensive or conspicuous nonfood items, cigarette cartons, or alcohol in exchange for SNAP benefits.

209.    In other words, firms that violate program rules that relate to alcohol and tobacco—the very thing the business-integrity rule is targeted toward—are punished more leniently than firms owned by someone who, at some prior point in their life, committed an offense related to alcohol or tobacco that had nothing to do with their business or integrity within a government program.

210.    Even firms that traffic in SNAP benefits may face a monetary penalty instead of permanent disqualification.

211.    So, while a business owner who acts without integrity in as a SNAP retailer receives only a temporary ban, someone who committed *any* offense relating to drugs, alcohol, or firearms *at any time* in their life is permanently excluded under the USDA's irrational rule.

212.    It is arbitrary and capricious for the USDA to save its most serious ban for offenses that have nothing to do with the program it administers.

**Count V:**
**USDA's Decision to Deny Carmen's Participation in SNAP Was Unreasoned**
**(7 U.S.C. § 2023(a)(15))**

213.    The allegations above are incorporated here in full.

214.    The USDA's application of its business-integrity rule to business owners who have committed any offense related to alcohol, tobacco, firearms, or controlled substance is also arbitrary and capricious because the agency never explained its decision to do so through notice-and-comment rulemaking.

215.    Nothing the USDA said during the rulemaking process explains why the agency applies its most severe punishment for drug and alcohol crimes unrelated to a business's operation.

216.    The only reference to these alcohol in the rulemaking was to note the appropriateness of denying a firm that had its liquor or lottery licenses suspended— something that fits with the agency's stated intent of strengthening penalties for retailers that violate the rules of government programs.

217.    Even if the USDA could conceivably determine that certain drug or alcohol crimes might reflect poorly on an owner's business integrity, the agency never explained— through a public rulemaking—why it thinks its business-integrity ban advances SNAP's statutory purpose.

218.    The failure of the USDA to explain its decision to extend that ban to all offenses relating to alcohol, tobacco, controlled substances, and firearms is arbitrary and capricious, just as this Court recognized when the SBA failed to explain its criminal-record rule for Paycheck Protection Plan applicants. *See Carmen's Corner Store v. SBA*, 469 F. Supp. 3d 459 (D. Md. 2020).

**Count VI:**
**USDA's Decision to Deny Carmen's Participation in SNAP Violates Equal**
**Protection as Applied to Business Owners Like Altimont**
**(U.S. Constitution, Amendment V)**

219.    The allegations above are incorporated here in full.

220.    The Due Process Clause of the Fifth Amendment forbids the government from denying equal protection of the law.

221.    Laws that discriminate against a class of persons arbitrarily or irrationally violate the Due Process Clause.

222.    By categorically banning people who have committed any offense related to alcohol, tobacco, firearms, and controlled substances, the USDA violates equal protection of the law guaranteed by the Due Process Clause.

223.    SNAP retailer applicants or would-be applicants who have previously committed offenses related to alcohol, tobacco, firearms, or controlled substances are similarly situated to other SNAP retailer applicants and would-be applicants, including those who have committed other offenses unrelated to SNAP but against whom the USDA does not discriminate.

224.    Because Altimont has committed offenses relating to firearms and controlled substances and applied for his store to be a SNAP retailer, he is similarly situated in all relevant respects to other people who apply or want to apply to be a SNAP retailer.

225.    The USDA's lifetime ban arbitrarily discriminates between similarly situated people on a basis with no rational relationship to SNAP or the owner's business integrity.

226.   The lifetime ban is arbitrary and irrational because many people who have committed such offenses have been rehabilitated and would present no unique risk to SNAP.

227.   The lifetime ban is arbitrary and irrational because many people who have committed such offenses did so long ago and present no current risk to SNAP considering that recidivism decreases with age.

228.   People change; it's irrational to reduce someone's integrity to something they did 20 years ago.

229.   The USDA imposes much more lenient bans for firms that actually violate SNAP's rules or show a lack of business integrity in ways that are directly relevant to the program.

230.   For instance, initial violations of SNAP rules can carry a ban of only six months to a year.

231.   A firm faces only a three-year ban if it "knowingly submitted" false information on its application that is both substantive and relates to the agency's ability to monitor the firm's compliance.

232.   Similarly, firms face only a three-year ban when it is the firm's *practice* to violate program rules and the agency has already advised the firm of the possibility that it was committing those violations.

233.   It carries only a five-year ban if firms do things like knowingly commit the types of violations that the business-integrity rule is targeted toward.  Only a five-year plan applies to a firm that accepts benefits from someone who it knows does not possess them legally, if the firm's coupon redemptions exceed its sales, or if it's the firm's *practice*

36

to sell expensive or conspicuous nonfood items, cigarette cartons, or alcohol in exchange for SNAP benefits.

234.   Even firms that traffic in SNAP benefits may face a monetary penalty instead of permanent disqualification.

235.   So, firms that knowingly violate SNAP's rules—including in ways that relate to the illegal sale of cigarettes and alcohol—receive a more lenient ban than a firm owned by someone who committed *any* offense relating to drugs, alcohol, or firearms *at any time* in their life.

236.   It is irrational for the USDA to save its most serious ban for offenses that have nothing to do with the program it administers.

237.   The USDA's lifetime ban is not rationally related to any legitimate governmental interest.

238.   By saving the agency's harshest punishment for individuals with a criminal record, rather than those firms that have proven themselves unreliable and dishonest participants in SNAP, the USDA violates the principles of equal protection that the Due Process Clause guarantees.

239.   Altimont poses no risk to SNAP; he has good business integrity and is an asset to his community.

240.   Carmen's Corner Store would further the purposes of SNAP if it were approved as a retailer.

241.   The USDA's categorical, lifetime ban of Altimont's businesses from SNAP undermines the purposes of SNAP by making quality food options less available in his community.

242.    Accordingly, the USDA's denial of Carmen's application was also invalid because it was unconstitutional.

## REQUEST FOR RELIEF

In light of the foregoing, Plaintiffs Carmen's Corner Store and Altimont Mark Wilks respectfully request the following relief:

A.    A determination that the USDA's administrative determination permanently denying Carmen's Corner Store in Frederick, Maryland, from participating in SNAP is invalid;

B.    An order vacating the USDA's denial of Carmen's Corner Store's application and permitting Carmen's Corner Store in Frederick, Maryland, to participate in SNAP as a retailer;

C.    A declaration that the USDA's determination that the application of Carmen's Corner Store in Frederick, Maryland, was moot is invalid;

D.    A declaration that the USDA's interpretation of its business-integrity rule to deny SNAP retailer applications based on the violation of non-licensure laws related to alcohol, tobacco, firearms, and controlled substances is contrary to the agency's regulation;

E.    A declaration that the USDA's interpretation of its business-integrity rule to deny SNAP retailer applications based on the violation of non-licensure laws related to alcohol, tobacco, firearms, and controlled substances is in excess of the agency's statutory authority;

F.    A declaration that the USDA's application of its business-integrity rule to deny SNAP retailer applications based on the violation of non-licensure laws related to alcohol, tobacco, firearms, and controlled substances is arbitrary and capricious;

G.      A declaration that the USDA's application of its business-integrity rule to deny SNAP retailer applications based on an owner's past violation of non-licensure laws related to alcohol, tobacco, firearms, and controlled substances violates the Due Process Clause of the Fifth Amendment.

H.      An injunction prohibiting the USDA from applying its business-integrity rule to deny SNAP retailer applications based on the violation of non-licensure laws related to alcohol, tobacco, firearms, and controlled substances;

I.      An award of Plaintiff's costs and expenses of this action, together with reasonable attorneys' fees, under the Equal Access to Justice Act or otherwise; and

J.      Any other legal or equitable relief to which Plaintiff may show itself to be justly entitled.

Dated: July 31, 2023

Respectfully submitted,

 /s/ Jared McClain

Jared McClain
Andrew Ward*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email:     jmcclain@ij.org
              andrew.ward@ij.org

 * Pro hac vice motion to be filed

Attorneys for Plaintiffs

**LOCAL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, Plaintiffs Carmen's Corner Store and Altimont

Mark Wilks certify that the matter in controversy in this action is not the subject of any

other action pending in any court or of any pending arbitration or administrative

proceeding.

Dated: July 31, 2023                    Respectfully submitted,

                                         /s/ Jared McClain
                                        _____

                                        Jared McClain
                                        Andrew Ward*
                                        INSTITUTE FOR JUSTICE
                                        901 N. Glebe Road, Suite 900
                                        Arlington, VA 22203
                                        Tel: (703) 682-9320
                                        Fax: (703) 682-9321
                                        Email:   jmcclain@ij.org
                                                 andrew.ward@ij.org

                                        * *Pro hac vice motion to be filed*

                                        *Attorneys for Plaintiffs*